1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

VICTOR GUERRERO,

      Plaintiff,

  v.

CALIFORNIA DEPARTMENT OF
CORRECTIONS AND REHABILITATION;
STATE PERSONNEL BOARD; et al.,

      Defendants.

_____/

No. C 13-05671 WHA

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

**INTRODUCTION**

In this Title VII and equal protection challenge, a Latino applicant seeks relief after being twice denied employment as a corrections officer. This order includes the findings of fact and conclusions of law following a six-day bench trial.

**PROCEDURAL HISTORY**

Plaintiff Victor Guerrero, who is Latino, was born in Mexico and brought to the United States by his parents in 1990 at age eleven. In 1995, at age fifteen, Guerrero began using an invalid social security number, a made-up number, to obtain employment. Guerrero continued to use the invalid SSN until 2007, when he became a permanent resident and obtained a valid SSN. Guerrero obtained United States citizenship in 2011.

In August 2011, after becoming a citizen, Guerrero applied to become a corrections officer at the California Department of Corrections. After passing CDCR's written and physical examinations, CDCR placed him on its eligibility list. The next step included completing CDCR's background investigation questionnaire. Question 75 asked: "Have you ever had or used a social security number other than the one you used on this questionnaire?" Guerrero answered "Yes" and wrote in an explanation.

United States District Court

For the Northern District of California

1    Several months later, CDCR informed Guerrero that he had been removed from the

2  eligibility list due to his previous use of an invalid SSN.  Guerrero appealed CDCR's decision to

3  the California State Personnel Board, which affirmed.

4    Guerrero reapplied to be a CDCR corrections officer in 2013.  After again answering

5  "Yes" to Question 75, and again explaining, CDCR again withheld him from the eligibility list.

6  Guerrero again appealed to SPB.  That appeal remains pending.

7    In December 2013, after receiving a right-to-sue letter from the Equal Employment

8  Opportunity Commission, plaintiff commenced this individual action in federal court and

9  eventually filed a first amended complaint in January 2014.  (This is not and has never been a

10 class action.)

11    In February 2014, defendants filed motions to dismiss, later withdrawn in light of a

12 second amended complaint alleging federal claims under Title VII, equal protection and due

13 process claims under Section 1983, as well as several state law claims, including a petition for a

14 writ of mandate.  That pleading sought injunctive and declaratory relief, compensatory damages

15 and attorney's fees and costs of suit against CDCR and SPB (Dkt. Nos. 1, 24,  25).

16    In March 2014, defendants filed motions to dismiss the second amended complaint.  A

17 May 2014 order dismissed without prejudice Guerrero's state-law claims (including his petition

18 for a writ of mandate without prejudice to re-filing in state court) under the Eleventh

19 Amendment.  The order granted in part and denied in part the remainder of defendants' motions

20 to dismiss.  Plaintiff's equal protection and substantive due process claims were also dismissed

21 (the equal protection claim was later revived).  In dismissing these claims, the order found

22 plaintiff's equal protection allegation insufficient to meet the *Iqbal* pleading standard and stated

23 that plaintiff's substantive due process claim would be "better adjudicated under the equal

24 protection analysis."  In denying in part defendants' motions to dismiss, the May 2014 order held

25 that plaintiff's procedural due process and Title VII claims needed a more complete record and

26 that discovery would proceed.  The order, however, dismissed plaintiff's Title VII claim against

27 SPB (Dkt. Nos. 35, 38, 52).

28

2

**United States District Court**
For the Northern District of California

1   In July 2014, defendants moved for summary judgment on all of plaintiff's remaining

2   claims. An order then denied without prejudice plaintiff's motion for leave to file a third

3   amended complaint to allow both sides the benefit of discovery. After a hearing on defendants'

4   motions for summary judgment on September 30, 2014, an order found that both sides would

5   benefit from further development of the record (Dkt. Nos. 79, 104).

6   In October 2014, an order granted plaintiff's renewed motion for leave to file a third

7   amended complaint, which alleged procedural due process, equal protection, and Title VII

8   violations against CDCR and SPB. The complaint sought declaratory and injunctive relief,

9   compensatory damages and attorney's fees and costs of suit. Guerrero sought the equitable

10  remedies of back pay and front pay. Fact discovery closed in January 2015. Guerrero's writ

11  remains pending in state court but has been stayed until his federal claims are resolved (Dkt.

12  Nos. 117, 154, 156).

13  In March 2015, the parties filed cross-motions for summary judgment. After a hearing in

14  April 2015, an order dismissed the procedural due process claim and denied all other motions,

15  leaving the Title VII and equal protection claims for trial against both CDCR and SPB.

16  After a final pretrial conference, an omnibus order limited the experts' direct testimony to

17  the opinions expressed in their FRCP 26 expert disclosures, but allowed testimony outside those

18  disclosures if raised during cross examination. The order set out trial rulings on a number of

19  other motions.

20  A bench trial began on June 15, 2015. In advance of this date and to accommodate a

21  witness, the Court, however, heard testimony from that witness on June 9, 2015. After a six-day

22  bench trial, the parties submitted proposed findings of fact and conclusions of law.

23  Rather than merely vet each and every finding and conclusion proposed by the parties,

24  this order has navigated its own course through the evidence and arguments, although many of

25  the proposals have found their way into this order. Any proposal that has been expressly agreed

26  to by the opposing side at least in part, however, shall be deemed adopted (to the extent agreed

27  on), even if not expressly adopted herein. It is unnecessary for this order to cite to the record for

28

United States District Court

For the Northern District of California

1   all the findings herein.  Citations will only be provided as to particulars that may assist the court

2   of appeals.  All declarative statements herein are factual findings.

### FINDINGS OF FACT

#### VICTOR GUERRERO

5       1.      Plaintiff Victor Guerrero was brought to the United States in 1990 by his parents,

6   who were lawful permanent residents, at age eleven.  He attended William C. Overfelt High

7   School in San Jose, but did not graduate.

8       2.      Since 1986, federal law has required employers to hire only documented workers

9   and a social security number is commonly used as such proof.  Guerrero began working at age

10  fifteen in 1995.  In order to work, Guerrero, with the help of an acquaintance and at the urging of

11  his parents, invented an invalid social security number, *i.e.*, one not actually issued by the Social

12  Security Administration.  The invented number eventually got issued to someone else in 2004.

13      3.      In 1997, at age seventeen, Guerrero applied to adjust his immigration status, in

14  part so he could receive a validly issued SSN.  This application languished until, via his later

15  marriage, Guerrero secured legal status in 2007.  While his application remained unaddressed,

16  Guerrero continued to use his invalid SSN to keep employment.

17      4.      Also in 1997, Guerrero applied to the Internal Revenue Service to receive an

18  Individual Taxpayer Identification Number.  An ITIN is a number issued by the IRS, upon

19  request, to individuals who, like Guerrero, are employed, but do not have valid SSNs, so that

20  they can pay their federal taxes.  The IRS issued Guerrero an ITIN in 1997.  Guerrero began

21  paying federal taxes with his legitimate ITIN in 1998 and continued doing so until 2007, when

22  he received his own valid SSN.

23      5.      Also in 1997, while working in Colorado, Guerrero suffered an injury on a job

24  and applied for workers' compensation benefits.  In completing the application form, Guerrero

25  consistently used the same SSN he had used with the employer in question, namely the invalid

26  SSN.

27      6.      In 2004, at age 25, Guerrero married.  At that time, Guerrero's wife, Nayeli

28  Ramirez, had already obtained legal permanent residency in the United States.  In 2006,

United States District Court

For the Northern District of California

1  Guerrero's wife became a United States citizen.  She then filed an "immediate relative" visa

2  petition on Guerrero's behalf.

3       7.      In 2005, at age 28, Guerrero earned his General Education Development

4  certificate.  He then pursued a degree in criminal justice at San Joaquin Delta College, but so far

5  has not earned that degree.

6       8.      In 2007, Guerrero became a lawful permanent resident and received his own

7  valid SSN.  Shortly thereafter, Guerrero amended his 2004 and 2005 tax returns, such that the

8  income earned during those years became associated with his new, valid SSN.  The amendments

9  also allowed Guerrero to claim and to obtain earned-income and child tax credits.

10      9.      In short, from 1997 (when Guerrero first applied for legal status), until 2007

11  (when he obtained legal status), Guerrero did everything he reasonably could have done to

12  navigate the immigration system and obtain legal residence.  The ten-year hiatus from his first

13  application to when he finally obtained legal status (and a valid SSN) resulted from an

14  administrative backlog, not from any failing by Guerrero.

15      10.     In February 2011, Guerrero became a United States citizen.

16      **CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION**

17      11.     The California Department of Corrections and Rehabilitation operates the state

18  prison system, including supervision of approximately 168,000 adult and 1,400 juvenile

19  offenders.  CDCR hires and employs corrections officers, all of whom must be United States

20  citizens.  In CDCR's overall hiring, there is virtually no difference between the selection rates

21  for Latinos and non-Latinos — Latinos, in fact, are over represented in CDCR's ranks compared

22  to their representation in the California workforce.

23      12.     In hiring corrections officers, California law requires CDCR to conduct a

24  thorough background investigation to determine that candidates have good moral character.

25  Corrections officers are authorized to carry firearms.  And, they are subject to pressure and

26  manipulation from inmates.  In determining moral character, CDCR evaluates applicants'

27  integrity, honesty, and good judgment, among other qualifications.  Integrity, honesty, and good

28  judgment remain important and valid qualifications for corrections officers.

**United States District Court**
For the Northern District of California

13.     CDCR closes approximately 1,000 background investigations per month. Currently, CDCR employs 65 sergeants, twelve lieutenants, and thirteen retired annuitants who work in the background investigation unit.

14.     At all material times, CDCR's process for determining the eligibility of a candidate required two phases.  Phase One consisted of a written test and a minimum-qualifications assessment.  Phase Two consisted of a background investigation, physical-fitness test, vision screening, psychological evaluation, and medical examination.  Following Phase Two, if they passed, eligible candidates enrolled in a training program at the academy.

15.     At the times in question (and still, it appears), Phase Two applicants completed a lengthy background questionnaire.  Upon receiving the questionnaire, CDCR automatically "withheld" — meaning disqualified — applicants who engaged in certain acts (*e.g.*, those with an adult felony conviction).  Prior use of an invalid SSN, however, did not always result in a decision to withhold.  In some cases, CDCR excused prior use of an invalid SSN.

16.     CDCR sergeants conducted tape-recorded interviews of applicants.  If CDCR withheld an applicant at this stage, the applicant would be sent a withhold letter, which laid out the main reasons for rejection.

**QUESTION 75**

17.     In 2009, CDCR began using Question 75 as part of its background investigation for the hiring of corrections officers.  Question 75 asked:  "Have you ever had or used a social security number other than the one you used on this questionnaire?"  The applicant could check "Yes" or "No."  If the applicant checked "Yes," the applicant had to attach a supplement explaining the "Yes" answer.

18.     CDCR borrowed Question 75 from the background investigation materials of a different law enforcement agency.  Before its adoption, CDCR never articulated any particularized need for the use of Question 75, but at least one legitimate reason has emerged in this case, namely providing CDCR with identifying information usable to conduct background checks.  That is, in addition to a valid SSN, CDCR may use invalid numbers to vet candidates.

19. From 2009 to 2014, 23,292 corrections officer candidates answered Question 75 through CDCR's background investigation. Of those applicants, 10,357 were Latino, 12,929 were non-Latino, and six were unidentified. Of those applicants, 42 answered "Yes" to Question 75. Of the 42, 33 were Latino and nine were non-Latino. Of the 33 Latinos, CDCR cleared fourteen Latinos and withheld nineteen Latinos. Of the nineteen, CDCR withheld nine at least in part because of their prior use of an invalid SSN. For two of those nine, use of an invalid SSN was the only reason mentioned in the withhold letter. Of the nine non-Latinos who responded "Yes" to Question No. 75, CDCR cleared three non-Latinos and withheld six non-Latinos. CDCR withheld all six non-Latinos without reference to their prior use of an invalid SSN. Nine applicants were withheld at least in part on account of prior use of an invalid SSN, all of whom were Latino.

20. The chart below illustrates the breakdown of the applicants who answered "Yes" to Question 75:



7

**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**GUERRERO'S APPLICATIONS TO CDCR AND APPEALS TO SPB**

21.     Guerrero first applied to be a corrections officer with CDCR in the summer of 2011, shortly after obtaining United States citizenship.  During Phase One, CDCR concluded that he possessed the minimum qualifications to be a corrections officer.  He successfully completed the written and physical examinations.  CDCR granted him a place on the corrections officer eligibility list.  CDCR then proceeded to Phase Two, the background investigation phase.

22.     Guerrero had held steady employment throughout his adult life, owned his own home, maintained a steady family life with his wife and three children, had taken some college classes in the field of criminal justice, and had submitted several personal and employer references to CDCR.  His record contained no blemishes other than his previous use of an invalid SSN.

23.     As part of Phase Two, Guerrero completed the background investigation questionnaire.  Question 75 asked:  "Have you ever had or used a social security number other than the one you used on this questionnaire?"  Guerrero answered "Yes" to this question, explaining that he had come the United States as a child and had used the invalid SSN for employment purposes.

24.     On October 31, 2011, Guerrero appeared for his pre-investigatory interview with the background investigator assigned to his file, Sergeant David Sharp, who informed Guerrero that his invalid SSN use would be an issue and requested additional documentary information.  Guerrero submitted additional tax returns and other information.

25.      Following the pre-investigatory interview, Sergeant David Sharp requested that Guerrero obtain a credit report under both his valid and invalid SSNs (TX 371E).  Guerrero complied.  He requested credit reports from a third party and submitted the reports to Sergeant Sharp.  Guerrero, however, made a point not to look at the credit report under the invalid SSN (out of respect for the privacy of its true recipient).  Sergeant Sharp received the reports prior to issuing the withhold letter.

26.     The credit report for the invalid SSN included Guerrero's name and date of birth under sections entitled applicant information and identification information, respectively.  The report showed six accounts opened from 2003–2011.

27.     On January 27, 2012, Sergeant Sharp sent a letter to Guerrero informing him that he had been withheld from the corrections officer eligibility list.  The withhold letter stated (TX 1):

> The fact that you committed identity theft for eight years but [sic] utilizing a social security number of a United States citizen causing unknown ramifications for that person by having income reported under their number that they were unaware of reflects that you are not suitable to assume the duties and responsibilities of a peace officer.  The result of the background investigation revealed that you fail to possess these qualifications.  You chose to use an unauthorized social security number even though you had [sic] taxpayers [sic] ID number, shows a willful disregard for the law. This 8 year act of unlawfulness shows a lack of honesty, integrity, and good judgment.

28.     One month later, Guerrero appealed CDCR's withhold decision to SPB, laying out the myriad of reasons that he remained qualified to be a corrections officer, despite his prior use of an invalid SSN.  In his appeal letter, Guerrero also alleged that he had been discriminated against, stating:  "I believe my disqualification as a candidate for Corrections Officer was based upon a subtle prejudice and discrimination because I am a Naturalized US citizen and not a US born citizen."

29.     SPB advised Guerrero that his appeal had been received, but SPB did not schedule an evidentiary hearing before an administrative law judge to determine the merits of Guerrero's discrimination claim, nor did SPB take any action at all regarding Guerrero's claim that CDCR had discriminated against him.  On August 21, 2012, SPB affirmed CDCR's decision to withhold Guerrero.  SPB's decision letter stated (TX 7):

> Appellant admits to learning of his illegal alien status at age seventeen and "inventing" a social security number (SSN) to gain employment.  Appellant further admits to using the same social security number for the purposes of filing income taxes and a workers' compensation claim.  While Appellant maintains that he did not steal another's social security number, his conduct demonstrates a knowingly [sic] and willful disregard for the law, as he admits to continued use of the SSN even after obtaining [sic]

United States District Court

For the Northern District of California

Individual Taxpayer Identification Number (ITIN) in 1997, thus demonstrating a lack of honesty, integrity and good judgment.

30.     After waiting the mandatory year, Guerrero again applied to be a corrections officer with CDCR in the spring of 2013.  He passed the written and physical exams in Phase One and proceeded to Phase Two, the background investigation stage, where he again answered "Yes" to Question 75, explaining that he had come the United States as a child and had used the invalid SSN for employment purposes.

31.     On October 21, 2013, CDCR again withheld Guerrero from the eligibility list, stating (TX 3):

> The fact that you committed identity theft for eight years but [sic] utilizing a social security number of a United States citizen causing unknown ramifications for that person by having income reported under their number that they were unaware of reflects that you are not suitable to assume the duties and responsibilities of a peace officer.  The result of the background investigation revealed that you fail to possess these qualifications.  You chose to use an unauthorized social security number even though you had [sic] taxpayers [sic] ID number, shows a willful disregard for the law.  This 8 year act of unlawfulness shows a lack of honesty, integrity, and good judgment.

32.     This section of CDCR's withhold letter was exactly identical, word for word, to the same paragraph earlier sent to Guerrero.  (The two letters even contained the exact same typos and grammatical errors.)

33.     In November 2013, Guerrero appealed the second CDCR withhold decision to SPB, which has yet to rule on that appeal.

34.     CDCR did not undertake an individualized assessment of Guerrero's case and history in determining his honesty, integrity, and good judgment.  While CDCR representatives testified that they vetted the recency, relevancy, and severity of Guerrero's prior invalid SSN use, no actual documentary evidence exists to support this assertion, and the withhold letters simply treated the use of an invalid SSN as a showstopper in Guerrero's case.  There are no memos in any files suggesting how CDCR might have considered the recency, relevancy, and severity of Guerrero's invalid SSN use, and this order finds that CDCR did not do so in his case.

35.     CDCR's assertion in the withhold letters that Guerrero continued to use an invalid SSN despite procuring an ITIN shows that CDCR fundamentally misunderstood the facts.

10

CDCR should have known (but did not) that an ITIN and an SSN are completely separate and do not substitute one for the other. Guerrero applied for the ITIN so he could pay his taxes, precisely because he did not have a valid SSN. The ITIN, however, could never have been a substitute for an SSN, valid or invalid. He used his ITIN to pay his tax bill but needed his invalid SSN to continue working. Instead of a negative character flaw, Guerrero's application for and use of an ITIN should have served as a positive character trait (desire to pay his taxes) and mitigated, to an extent, his use of an invalid SSN. CDCR failed to see that Guerrero's ITIN use stood out as a positive rather than a negative.

36. CDCR's emphatic accusation that Guerrero had committed "identity theft" was incorrect as well. Identity theft involves a thief misappropriating the name, address, and/or credit history of someone else to conduct credit transactions, such as using someone's name, address, and credit card number to steal a television. Guerrero, however, always used his own name (and true address). He never used anyone else's name, address, or credit card. He did use an invalid SSN and, after the SSA issued that number to someone else in 2004, Guerrero could be said to have misappropriated that person's number, although no evidence came up at trial to show any harm to the true holder of that number.

37. The credit report associated with the invalid SSN (TX 371B) came into evidence only to show the information available to CDCR — not for the truth of whether Guerrero used the invalid SSN to obtain credit (it being hearsay for that purpose). At no time during the application process did CDCR cite this credit report and it had no impact on CDCR's decision to withhold Guerrero. The withhold letter — which did not mention the issue of credit — set forth all substantial reasons for the withhold. No argument has been made that Guerrero ever failed to make good on the credit accounts or that he somehow cheated creditors. The worst that can be said is that, to open credit accounts, he used the same SSN he had already used for employment so that the stores could trace his true work history.

38. This order finds that CDCR withheld Guerrero solely based on the fact of his invalid SSN use, without delving into any relevant analysis surrounding the recency, relevancy, or severity of Guerrero's invalid SSN use.

39.     Today, Guerrero lives with his wife and three children in Stockton, California. He works as a solid waste recovery worker for the Stockton Public Works Department.  Despite the multiple rejections, Guerrero still wishes to become a corrections officer with CDCR.  He attended all but one day of the evidence at trial (and testified himself).

**CALIFORNIA STATE PERSONNEL BOARD**

40.     At all material times, the California State Personnel Board enforced the civil service statutes, among other responsibilities.  SPB also resolved appeals of CDCR's withhold decisions, but SPB was not involved in CDCR's initial withhold decisions.  SPB had the power to reverse CDCR's withhold decisions through the appeals process.

41.     SPB was (and remains) a control agency for CDCR and oversaw equal opportunity programs throughout California.

42.     If an appellant filed a timely appeal of a CDCR withhold decision, SPB would acknowledge receipt of the appeal via a letter.  Both sides could then submit documents to SPB, but most appeals did not involve a hearing.  Instead, SPB resolved most appeals through investigation and/or written determination.

43.     An SPB investigative officer would then draft a recommended decision.  That decision would be reviewed by the manager of the Merit Appeals Unit.  The five-person State Personnel Board would then issue a final decision, unless it remanded the case to the investigative officer.  Upon entry of a final decision, the candidate could seek judicial review.

44.     As detailed above, Guerrero appealed CDCR's rejection of his first application, which SPB affirmed.  Guerrero's second appeal to SPB, of CDCR's second rejection, remains pending.

**OTHER APPLICANTS WITHHELD IN WHOLE OR IN PART
FOR HAVING USED AN INVALID SSN**

45.     Before trial, the parties were requested to submit joint summaries of the nine Latino applicants who CDCR withheld in whole or in part due to their prior use of an invalid SSN, but counsel were unable to agree on summaries for the nine applicants.  Therefore, the Court has thoroughly reviewed each of these voluminous administrative files and created its own

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    summaries, for the benefit of the record and the court of appeals.  These lengthy findings will be

2    included in an appendix to this order.

3         46.    In all nine cases, CDCR failed to appropriately apply the three EEOC factors to

4    assess an individual's use of an invalid SSN.  The first factor calls for careful consideration of

5    "the nature and gravity of the offense or conduct."  The second factor considers "the time that has

6    passed since" the conduct.  The third factor looks to "the nature of the job held or sought."  U.S.

7    EQUAL EMP'T OPPORTUNITY COMM'N, EEOC ENFORCEMENT GUIDANCE: CONSIDERATION OF

8    ARREST AND CONVICTION RECORDS IN EMPLOYMENT DECISIONS UNDER TITLE VII OF THE CIVIL

9    RIGHTS ACT OF 1964 (2012).  CDCR has stated: "[A]ll candidates for State civil service shall

10   possess the general qualifications of integrity, honesty, dependability, thoroughness, accuracy,

11   good judgment, and the ability to assume the responsibilities and to conform to the work

12   conditions of employment" (TX 183).  CDCR, however, has failed to sufficiently link the use of

13   an invalid SSN for employment purposes to the qualifications required to be a corrections officer.

## ANALYSIS AND CONCLUSIONS OF LAW

### TITLE VII

16        Under a Title VII disparate-impact theory, the plaintiff has the burden to prove that a

17   "facially neutral employment practice produces a significant adverse impact on a protected class."

18   *Clady v. Los Angeles County*, 770 F.2d 1421, 1427 (9th Cir. 1985).  Once the plaintiff establishes

19   prima facie disparate impact, the burden shifts to the employer to prove that there existed a

20   "business necessity," *i.e.*, "a manifest relationship to the employment in question."  *Griggs v.

21   Duke Power Co.*, 401 U.S. 424, 431–32 (1971).  Proving business necessity involves

22   consideration of the Equal Employment Opportunity Commission factors and guidelines, which

23   will be discussed below.  If the defendant establishes business necessity, the plaintiff then bears

24   the burden of showing that alternative tests exist that would meet the employer's legitimate hiring

25   interests as efficiently, without a similarly discriminatory effect.  *Albermarle Paper Co. v. Moody*,

26   422 U.S. 405 (1975).  In 1991, Congress codified these decisions in Title VII.  42 U.S.C.

27   2000e–2(k).

28

1

**DISPARATE IMPACT**

2

"Title VII prohibits both intentional discrimination (known as 'disparate treatment') as

3

well as, in some cases, practices that are not intended to discriminate but in fact have a

4

disproportionately adverse effect on minorities (known as 'disparate impact')." *Ricci v.*

5

*DeStefano*, 557 U.S. 577, 577–78 (2009).  Under a disparate-impact theory, a plaintiff establishes

6

a prima facie violation by showing that a particular employment practice causes a disparate

7

impact on the basis of race, color, religion, sex, or national origin.  Disparate-impact analysis

8

applies to both objective and subjective hiring policies.  *Rose v. Wells Fargo & Co.*, 902 F.2d

9

1417, 1424 (9th Cir. 1990).

10

In examining disparate-impact claims, the Supreme Court has held that focusing on the

11

number of minorities otherwise hired or promoted inappropriately ignores the disparate effect of a

12

specific requirement or practice.  Thus, the Supreme Court held it inappropriate to focus on the

13

bottom line:  "[D]espite their employer's nondiscriminatory 'bottom line,' . . . that 'bottom line'

14

is no defense to this prima facie case." *Connecticut v. Teal*, 457 U.S. 440, 451 (1982).  Title VII

15

protects individual minorities, guaranteeing "the opportunity to compete equally." *Ibid.*  Thus,

16

the fact that Latinos have been hired by CDCR at a disproportionately favorable rate does not bar

17

this suit.

18

To establish prima facie disparate impact, a plaintiff must:  "(1) identify the specific

19

employment practices or selection criteria being challenged; (2) show disparate impact; and (3)

20

prove causation." *Ibid.*  "Plaintiffs generally cannot attack an overall decisionmaking process in

21

the disparate-impact context, but must instead identify the particular element or practice within

22

the process that causes an adverse impact." *Stout v. Potter*, 276 F.3d 1118, 1124 (9th Cir. 2002).

23

The plaintiff must provide statistical evidence demonstrating that the challenged employment

24

policy selects applicants of a protected class at a lower rate than their percentage in the applicant

25

pool. *Id.* at 1122.

26

Guerrero argues that Question 75 has a disproportionate impact on Latinos.  (No

27

disparate-treatment claim is presented in this lawsuit.)  Guerrero challenges CDCR's use of

28

Question 75 specifically, and CDCR's discretion in assessing an applicant's response (and

14

**United States District Court**
For the Northern District of California

explanation) to that particular question.  Thus, this order finds that plaintiff has adequately

identified a specific practice required for stating a disparate-impact claim, namely routine use of

Question 75.

In our case, from 2009 to 2014, 23,292 corrections officer applicants entered the

background investigation process.  Of the 23,292 applicants, 42 responded "Yes" to Question 75.

Of the latter, 33 were Latino and nine were non-Latino.  Of the 33 Latinos, CDCR cleared

fourteen Latinos and withheld nineteen Latinos.  Of the nineteen, nine were withheld at least in

part because of their prior use of an invalid SSN.  Of the nine non-Latinos who responded "Yes"

to Question 75, CDCR cleared three non-Latinos and withheld six non-Latinos.  CDCR withheld

all six non-Latinos without reference to their prior use of an invalid SSN.  *In other words, all nine

of the individuals withheld at least in part on account of prior use of an invalid SSN were Latino*.

Although the number of Latino applicants who answered "Yes" to Question 75 and the number of

those who were withheld constitute a small sample size, plaintiff's expert witness satisfactorily

took this problem into account in his statistical analysis.

Plaintiff's statistical expert, Dr. Marc Bendick, compared the expected Latino

representation adversely affected by Question 75 (42.1%) with the actual Latino representation

withheld by Question 75 (100.0%).  This comparison revealed that Latinos are 2.4 times more

likely to be withheld versus their expected representation.  Through this statistical analysis, a ratio

greater than 1.0 indicates adverse impact.  While Dr. Bendick's analysis assumed that all seven of

the applicants withheld in part due to their prior invalid SSN use would have been cleared but for

their answers to Question 75 (and thus that Question 75 was the showstopper for all seven), he

confirmed that the disparate impact on Latinos would still be statistically significant even if only

two of these seven applicants would have been cleared but for their answers to Question 75.

CDCR withheld two applicants (including Guerrero) solely because of Question 75.

Defendants' statistical expert, Dr. Michael DuMond, only considered these two applicants in

determining whether Question 75 had an adverse impact on Latinos.  He did not consider that

CDCR withheld seven applicants in part due to their answers to Question 75.  At trial, Dr.

DuMond conceded that if the use of an invalid SSN was the deciding factor for even two of the

15

1    seven applicants withheld in part due to prior invalid SSN use, then Question 75 had a statistically

2    significant adverse impact on Latinos.

3        This order finds that at least two of the seven applicants that CDCR withheld in part due

4    to their invalid SSN use would have been cleared but for the implementation of Question 75.

5    Thus, combined with the two applicants withheld solely based on their invalid SSN use, Question

6    75 served as a showstopper for at least four applicants (all of whom were Latino).  This disparate

7    impact was statistically significant, as both plaintiff's and defendants' statistical experts

8    conceded.  In summary, this order finds CDCR's facially neutral hiring policy that included

9    Question 75 caused a prima facie disparate impact on Latinos.

10                                    **BUSINESS NECESSITY**

11       In *Griggs*, 401 U.S. at 427, the private employer instituted new policies soon after

12   Congress enacted the Civil Rights Act of 1964.  These new policies required applicants to have a

13   high school education or satisfactory scores on two aptitude tests, which substantially affected

14   African-American applicants.  The Supreme Court found that the broad aptitude tests and the high

15   school diploma requirement were inadequate "as fixed measures of capability."  *Id.* at 433.

16   Although the employer argued that the requirements improved "the overall quality of the work

17   force," evidence demonstrated that employees without these requirements still performed

18   satisfactorily.  *Id.* at 431.  Thus, the employer did not show a  "demonstrable relationship to

19   successful performance of the jobs for which it was used."  *Ibid.*  An employer must ensure that

20   the hiring policy "measure[s] the person for the job and not the person in the abstract."  *Id.* at 436.

21       The Supreme Court subsequently declined to rely on "common-sense" based assertions of

22   business necessity, calling instead for empirical evidence to support a hiring policy's

23   effectiveness.  *Dothard v. Rawlinson*, 433 U.S. 321 (1977).  In *Dothard*, a minimum height and

24   weight requirement for corrections officers had a disparate impact against women.  The Board of

25   Corrections argued that the requirements measured the strength required of corrections officers.

26   The Supreme Court rejected this argument, however, as one not sufficiently supported by

27   empirical evidence.  The employer must instead produce "evidence correlating the height and

28

United States District Court
For the Northern District of California

16

weight requirements with the requisite amount of strength thought essential to good job

performance." *Id.* at 331.

Our court of appeals has established a "business necessity" standard higher than a loose

"rational basis" standard but less than strict necessity.  An employer must show that a

pre-employment test that has a disparate impact on a racial minority is "significantly job-related"

or serves a legitimate business interest.  *Contreras v. City of Los Angeles*, 656 F.2d 1267, 1276

(9th Cir. 1981) (quoting *Craig v. County of Los Angeles*, 626 F.2d 659, 662 (9th Cir. 1980)).  In

*Contreras*, a municipal civil service commission instituted a new senior accountant examination.

The plaintiffs there, who already worked for the municipality, had to pass this new examination in

order to transfer to a newly created department.  They alleged that the examination discriminated

against Spanish-surnamed applicants.  Our court of appeals held that an employer "must

demonstrate a significant relation between the challenged selection device or criteria and the

important elements of the job or training program, not merely some 'rational basis' for the

challenged practice."  The employer "need not establish a perfect positive correlation between the

selection criteria and the important elements of work."  *Contreras* further specified that the

"employer's burden is met with less than proof of absolute business necessity."  *Ibid.*  An

employer can satisfy its burden by proving that a screening device is "significantly correlated"

with or predictive of important elements of the job.  *Id.* at 1277, 1280.

The Eighth Circuit has held that even where criminal convictions are concerned, an

employer cannot implement "a sweeping disqualification for employment resting solely on past

behavior . . . where that employment practice has a disproportionate racial impact and rests upon

a tenuous or insubstantial basis."  *Green v. Missouri Pac. R.R. Co.*, 523 F.2d 1290, 1296 (8th Cir.

1975).  In *Green*, the employer disqualified any applicant convicted of a crime other than a minor

traffic offense.  The plaintiff, who had been convicted for refusing military induction three years

prior, argued that this absolute bar had a disparate impact on blacks and did not relate to job

performance.  The employer cited several reasons, such as fear of cargo theft and alleged lack of

moral character of persons with convictions, claiming its policy constituted a business necessity.

While acknowledging those valid considerations, *Green* concluded that they did not justify the

United States District Court

For the Northern District of California

17

across-the-board disqualification. *Green* instead adopted a case-by-case approach to "business necessity" regarding criminal history. *Green* laid out three factors to consider: (1) "[t]he time elapsing since the conviction" (2) "the degree of the felon's rehabilitation, and" (3) "the circumstances under which the crime was committed." *Id.* at 1297 (internal quotation marks and citation omitted).

The EEOC amended its manual in 1987 to include the three *Green* factors as part of proving up business necessity. In 2012, it issued further requirements, calling for employers to perform an individual assessment of applicants excluded by the criminal conduct screen. Our court of appeals has not explicitly adopted the *Green* factors or the EEOC Guidelines. It has, however, held that federal courts should give "great deference" to EEOC guidelines "where there are [no] compelling indications that [they are] wrong." *See e.g., Contreras*, 656 F.2d at 1281 (citing *Griggs*, 401 U.S. at 434) (finding that courts should give EEOC guidelines great deference); *Garcia v. Spun Steak Co.*, 998 F.2d 1480, 1489 (9th Cir. 1993) (en banc) (discussing when courts can depart from the EEOC guidelines). Such "compelling indications" might include "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and alter pronouncements, and all those factors that give it power to persuade." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

Here, given that use of an invalid SSN to obtain employment creates a disparate impact on Latinos, the basic issue boils down to whether withholding an applicant based on this SSN misuse constitutes a business necessity. The defendant bears the burden of proving this defense. There is no evidence that CDCR properly applied all the *Green* factors adopted by the EEOC (recency, relevancy, and severity). Instead, the record reveals CDCR conclusively dismissed Guerrero's application. Consequently, this order finds that CDCR withheld Guerrero's application in violation of Title VII.

This order finds that the EEOC 2012 Enforcement Guidance on the Consideration of Arrest and Criminal Conviction Records is entitled to deference because thoroughness is clearly evident in its consideration, its reasoning is valid, and it is consistent with earlier pronouncements. *See Skidmore*, 323 U.S. at 140. The EEOC "has well-established guidance

18

United States District Court

For the Northern District of California

applying Title VII principles to employers' use of criminal records to screen for employment."

EEOC Enforcement Guidance on the Consideration of Arrest and Criminal Conviction Records,

Section II (Apr. 25, 2012).  Notably, the EEOC held meetings in 2008 and 2011 to specifically

address employer policies on criminal history records in response to the Third Circuit's *El v.

SEPTA*, which questioned the validity of the EEOC's 1987 Guidance.  The EEOC subsequently

updated its guidelines in 2012 regarding criminal record exclusions, building on the *Green* factors

(recency, relevancy, and severity) adopted in 1987 and incorporating recent court decisions and

criminological research.  Thus, the EEOC Guidance in this context is persuasive and entitled to

deference.  Although our case does not involve an arrest or criminal conviction, CDCR treated

Guerrero's use of an invalid SSN as criminal conduct and thus this guideline should be applied

here.

Given that CDCR does not automatically withhold applicants based on their answer to

Question 75 and asks for supplemental explanations, CDCR necessarily allows individual

assessment of each applicant in determining the "general qualifications of integrity, honesty, good

judgment, and accuracy."  This consideration of Question 75 is in line with the EEOC's most

recent emphasis on individualized assessment regarding criminal history exclusions.  The

question then is whether CDCR individually assessed Guerrero's application in practice by

properly applying the *Green* factors adopted by the EEOC, despite his answer to Question 75.

This order finds that it did not.  CDCR argues now that it did an individual assessment, but there

is no evidence that CDCR paid anything more than lip service to Guerrero's circumstances under

the EEOC factors.

The first EEOC factor in determining the related risk of a specific crime to a specific

position is "careful consideration of the nature and gravity of the offense or conduct."  *Ibid*.

"Careful consideration" of the nature of Guerrero's conduct in relation to the character traits

required of a corrections officer demonstrates minimal risk.  Guerrero entered the United States

with his family at age eleven.  At age fifteen, Guerrero sought work in order to help support his

family.  He invented a social security number (at his parents' suggestion) in order to obtain

employment.  Because Guerrero already began working with the invalid SSN as a juvenile, he

had little choice but to continue using the invalid SSN as an adult.  The alternative would have been to either stop working or resort to illegal commerce to support his family.

It is true that the use of an invalid SSN potentially accumulated work credit for someone else and contravened the public interest by potentially spoiling public records.  It is also conceivable that whoever eventually received the SSN in question, in 2004, encountered trouble with his or her own identity due to Guerrero's misuse of that SSN, although no such actual trouble has been proven herein.

On balance, however, Guerrero mitigated much of these potential consequences with his subsequent remedial conduct.  Guerrero initially misused the invalid SSN as a juvenile in order to help support his family.  When he learned of his true immigration status, he promptly applied to adjust his status.  This application sat pending for over ten years, due to agency backlogs.  In the meantime, for the sake of consistency, Guerrero carried on with the same SSN to continue employment.  Guerrero also obtained a legitimate ITIN and paid taxes with his ITIN until he obtained a valid SSN.  When Guerrero became a lawful permanent resident, and thus eligible for an SSN in 2007, he obtained a new, valid SSN almost immediately.  He then promptly retroactively amended his taxes from 2004 and 2005 to attribute his income to his new SSN and informed his then-employer of his new SSN.  These efforts to cure the harm created by his use of an invalid SSN are commendable and should have been taken into account in CDCR's assessment.

Furthermore, Guerrero's SSN misuse did not constitute "identity theft" as CDCR claimed. In *Flores-Figueroa v. United States*, 556 U.S. 646, 656–57 (2009), the Supreme Court held that to prove identity theft under federal law, "the government must show that the defendant knew that the means of identification at issue belonged to another person."  The worst that can be said of Guerrero's use of an invalid SSN, from a criminal law perspective, is that it potentially violated 42 U.S.C. 408(a)(7)(B) ("falsely represent[ing] a number to be the social security account number assigned by the Commissioner of Social Security to him") and 18 U.S.C. 1546(b)(3) (providing a "false attestation" on an employment form).  Even so, our court of appeals has held that these

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

crimes (in the social security context) did not constitute crimes of "moral turpitude" for immigration purposes.  *See Beltran-Tirado v. I.N.S.*, 213 F.3d 1179, 1185 (9th Cir. 2000).

The second EEOC factor looks to "the time that has passed since" the conduct.  Neither the EEOC Guidance nor our court of appeals has yet endorsed any particular time frame.  This order, however, finds the Third Circuit's approach in *El v. SEPTA* instructive:  "Title VII . . . require[s] that the policy under review accurately distinguish between applicants that pose an unacceptable level of risk and those that do not."  *El v. SEPTA*, 479 F.3d 232, 244–45 (3d Cir. 2007).

There is no indication in the record that Guerrero's misuse of an SSN under his circumstances "pose[d] an unacceptable level of risk" for CDCR if Guerrero had been placed in a corrections officer position.  In *El*, the employer produced credible expert testimony that former violent criminals, crime-free for many years, still had a slighter higher chance than ordinary citizens to recidivate.  In contrast, CDCR has not produced any evidence, expert testimony or otherwise, that previous and corrected SSN misuse six years in the past imposes any discernable danger of "those officers [being] corrupted by inmates to commit serious misconduct that harm public safety."  Nor has CDCR produced any empirical evidence in general that would tie previous SSN misuse to obtain employment to the character traits required of corrections officers.  In fact, plaintiff's expert witness testified (and this order so finds) that there is no heightened risk of recidivism after seven years compared to an ordinary citizen.  CDCR did not attempt to rebut this testimony.  Thus, given that Guerrero had not used the invalid SSN for six years at the time of his second application, and that he began misusing it as a juvenile, CDCR's inability to demonstrate an "unacceptable risk" weighs heavily in favor of Guerrero.

The third EEOC factor looks to "the nature of the job held or sought."  Question 75 may be useful when CDCR looks to the reason an applicant may be associated with more than one SSN, as it may reveal more serious offenses such as tax evasion or intentional fraud.  Such revelations would convincingly bear significant weight for a position giving an employee wide discretion in a prison environment.  Such revelations, however, do not apply in Guerrero's case.

Guerrero has never been guilty of tax evasion or intentional fraud. Guerrero's SSN misuse, while a negative, was a minor negative. CDCR has not met its burden of effectively linking Guerrero's SSN misuse to the ability to maintain integrity, honesty, and good judgment as a corrections officer.

Taking all three EEOC factors into account (recency, relevancy and severity) in the business necessity analysis, this order finds that CDCR violated Title VII by failing to apply the EEOC guidelines in Guerrero's case. This order further finds that SPB violated Title VII in handling Guerrero's appeal. CDCR's and SPB's inadequate assessment is further evidenced by their reliance on mistaken assumptions, such as the belief that ITINs can be used for employment purposes, that use of both an ITIN and a SSN somehow showed unlawful conduct, and the statement that Guerrero had committed identity theft. Nor have defendants proven that Guerrero's SSN misuse is "significantly job-related" to the corrections officer position. Rather than individually assessing Guerrero's application and properly weighing all relevant factors, defendants inappropriately used Question 75 as a showstopper.

In sum, CDCR has a legitimate business interest in determining whether a corrections officer applicant has the requisite character traits, and Question 75 can serve this purpose. But because Question 75 has a disparate impact on Latinos, CDCR can use Question 75 only if it also considers the three EEOC factors and since it did not in Guerrero's case, CDCR erred. This order does not find anything in the record that would indicate that Guerrero embodied an unqualified — or even a less qualified — applicant. Thus, CDCR's effectively single-issue withhold based on Question 75 amounted to an "arbitrary . . . barrier to employment" in violation of Title VII. *Griggs*, 401 U.S. at 431.

### EQUAL PROTECTION

"Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). "Necessarily, an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on

United States District Court

For the Northern District of California

one race than another." *Washington v. Davis*, 426 U.S. 229, 242 (1976).  Disparate impact alone, however, "does not trigger the rule . . . that racial classifications are to be subjected to the strictest scrutiny and are justifiable only by the weightiest of considerations."  *Ibid.*

Here, plaintiff did not make a prima facie case of discriminatory purpose.  Although disparate impact can be circumstantial evidence of discriminatory purpose, its weight in this case is attenuated by the "totality of the relevant facts."  *Ibid.*  Nothing in the record indicated that CDCR used facially-neutral Question 75 as "a purposeful device to discriminate" against Latinos. *Ibid.*  Thus, plaintiff insufficiently demonstrated discriminatory purpose.

Disparate impact alone does not trigger strict scrutiny.  Accordingly, this order finds that CDCR had a rational basis for including Question 75 in its background investigation.  *First*, CDCR had a legitimate reason for inquiring into applicants' history, as corrections officers are given wide discretion in a prison environment.  Neither party disputes that honesty, integrity, and good judgment are important character traits for such a position.  Prior use of an invalid SSN by itself is rationally probative of these character traits.  *Second*, Question 75 supplies a further avenue for investigative follow-up by supplying another SSN used by the applicant that could lead to probative information and life experiences.  By requiring supplemental explanations, CDCR can use the question to uncover other offenses related to prior SSN misuse and to more accurately trace an applicant's identity.  Thus, because Question 75 was facially neutral and rationally served legitimate interests, CDCR did not violate the Equal Protection Clause.  That claim is **DISMISSED**.

## CONCLUSION

To the extent stated herein, Guerrero's Title VII claims against CDCR and SPB are **GRANTED**.  Guerrero's equal protection claim is **DISMISSED**.  Nothing in this order prohibits use of Question 75 so long as the disparate impact is ameliorated by individualized use of the EEOC factors.  Please attend another hearing on **SEPTEMBER 24, 2015, AT EIGHT A.M.**, to determine the extent of relief.  Plaintiff shall please file a brief summarizing his requested relief by **AUGUST 27**.

Defendants shall please respond by **SEPTEMBER 10**.  No replies.  In the meantime, all parties shall return to Magistrate Judge Donna Ryu for further mediation.

      **IT IS SO ORDERED.**

Dated:  July 21, 2015.



WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

United States District Court
For the Northern District of California

**APPENDIX OF SUMMARIES OF APPLICANTS THAT CDCR WITHHELD IN WHOLE OR IN PART due to their PRIOR USE OF AN INVALID SSN**

1.      CDCR withheld C.R. in 2012 in whole because he used an invalid SSN from 1988 to between 2004 and 2006.  Upon entering the United States without documentation, C.R. purchased an invalid SSN and green card for $50 so he could obtain employment.  A former employer, nonetheless, fired C.R. because he could not provide proper and valid documentation to work.  Moreover, the government suspended his drivers license because he did not have a valid SSN.  The withhold letter stated: "[Y]ou fraudulently obtained legal documents in order to gain employment while you were an illegal resident in the United States of America.  Your actions reflect your poor judgment and a general disregard for the law that extended over a duration of approximately sixteen years.  This pattern of irresponsibility raises concerns . . . "  Although CDCR only cited the above reason in the withhold letter, the background investigation also revealed that in 2003, C.R. pled guilty to willful cruelty to a child, after his ex-wife accused him of molesting his oldest daughter.  On his Background Investigation Questionnaire, C.R. revealed that he had been fired more than twice and had been disqualified from the Los Angeles Police Department due to his record.

2.      C.R.'s withhold letter and file suggest that CDCR did not properly weigh the EEOC factors when withholding him because of his SSN misuse.  In its withhold letter, CDCR cited the length of misconduct but failed to properly weigh mitigating factors:  C.R. stopped using the invalid SSN when he became a legal resident and only used the invalid number for employment purposes, thus demonstrating minimal risk.  CDCR also failed to consider that the harm caused by the conduct was likely insignificant.  Nor did CDCR apply the second EEOC factor, recency.  In C.R.'s withhold letter and internal discrepancy note, CDCR did not calculate the time that had elapsed — approximately eight years — since C.R.'s conduct.  Because C.R. only used an invalid SSN for employment purposes, CDCR failed to effectively connect C.R.'s conduct to his ability to maintain integrity, honesty, and good judgment as a corrections officer (TX 183).

United States District Court

For the Northern District of California

3.     CDCR withheld F.J. in 2014 because he had previously used an invalid SSN, alias, and fake ID.  F.J., who was born in the United States and thus a citizen, used an invalid SSN at age seventeen or eighteen, approximately fifteen years prior to applying to CDCR.  On his application, F.J. said he used the invalid SSN at a young age to get a job.  During his pre-investigatory interview, however, he admitted that he used the invalid number so that his mother could continue to claim him as a dependent.  The investigator concluded that F.J. lacked integrity and honesty, as "he knowingly and willingly committed fraud for the financial benefit of him and/or his mother (evading taxes)."  The withhold letter also cited that during his interview, F.J. admitted to using an alias but failed to disclose it on his personal history statement.  The letter stated:  "Your failure to provide accurate information . . . as well as your unwillingness to be forthright . . . indicate you do not possess the general qualifications" required to serve as a peace officer with CDCR.

4.     In F.J.'s withhold letter, CDCR cited the nature and gravity of the offense, fraud and tax evasion.  The file does not indicate, however, that CDCR considered mitigating factors.  F.J. was seventeen or eighteen at the time of his SSN misuse.  Moreover, CDCR failed to consider recency, or lack thereof.  Approximately fifteen years had elapsed.  Although CDCR may be justified in withholding an applicant for tax fraud, which this order need not decide, a review of F.J.'s file does not indicate that CDCR applied all three EEOC factors properly (TX 81, 190).

5.     CDCR withheld J.M.(2) (the files contained multiple applicants with the initials J.M.) in 2011 for failing to register for the selective service, lying about why he did not register, and using an invalid identification and an invalid social security card to gain fraudulent employment.  J.M.(2) stated that he did not register for the selective service because he immigrated to the United States at age 26; however, documents and information — his education, marriage certificate, list of residences, and misdemeanor record (DUI and driving with a suspended licence) — disclosed by the applicant revealed that he was in the United States before age 26.  J.M.(2) admitted that, in 1991 at age seventeen, he used his brother's name and birth certificate to obtain a California identification card so that he could work and

United States District Court
For the Northern District of California

1    support his family in Mexico.  J.M.(2) stated that he paid income taxes yearly using the invalid

2    SSN.

3        6.      In withholding J.M.(2), CDCR did not appropriately apply the three EEOC

4    factors.  He began using an invalid SSN as a juvenile for employment purposes only, "did [his]

5    income tax year by year," and ceased using an invalid number once the government issued him

6    a valid SSN.  Moreover, in an internal discrepancy notice, CDCR acknowledged yet dismissed

7    the lack of recency, clearly ignoring the EEOC guidelines:  "Although these issues [use of an

8    invalid SSN to obtain work for eight years and use of his brother's name] may not be recent, it

9    reflects poor judgment and non-abeyance of the law.  These issues are relevant and the

10   applicant is unsuitability [sic] for a peace officer position, with this Department, at this time."

11   Given the nature of J.M.(2)'s conduct, CDCR did not effectively link the SSN misuse to the

12   candidate's ability to maintain integrity, honesty, and good judgment as a corrections officer

13   (TX 192).

14       7.      CDCR withheld M.R. in 2007 without mention of using an invalid SSN and

15   again in 2011 in part because he used an invalid SSN.  In the 2007 withhold letter, CDCR

16   concluded that M.R. was unsuitable and omitted pertinent information.  The 2006 "possible

17   withhold recommendation," approved in 2007, stated:  "Disclosed with [Riverside Sherif's

18   Office] filing invalid claim of work comp. in 1986, also disclosed giving his last name to a

19   child who was not his in addition, signed immigration documents for him as an adult in 2004.

20   This information was not disclosed on CDCR PHS."  In the late 1970s, M.R. gave his last

21   name to his girlfriend's son.  Subsequently, in 2004, M.R. signed INS papers for the child, then

22   an adult, falsely claiming that he was M.R.'s son.  Additionally, M.R. failed to list one of

23   several agencies he had applied to that required a background check.  As stated on a CDCR

24   discrepancy notice, M.R. did not disclose his termination from the United States Postal Service

25   (USPS) in 1993.

26       8.      In 2011, the CDCR again found M.R. unsuitable because he falsified INS

27   documents (falsely claiming someone as his son), received fraudulent benefits, used an invalid

28

SSN number, and failed to complete the background materials as instructed.  The withhold

letter also cited that M.R. failed to disclose that he had fraudulently filed and received

worker's compensation in 1986.  M.R. used an invalid SSN for a short time to work before

becoming a resident alien and subsequently a citizen in 1987, over two decades prior to

applying.  CDCR also noted on the withhold letter that M.R. failed to disclose the name of his

former spouse, as indicated on a prior application.  According to the 2011 withhold letter, M.R.

previously applied to CDCR in 2003, when he also neglected to report his 1986 worker's

compensation claim.

9. Examination of the first EEOC factor, severity, weighs in M.R.'s favor,

contrary to CDCR's findings.  M.R. only used the invalid SSN for a brief period of time for

employment purposes.  CDCR also failed to consider the second EEOC factor, recency.  M.R.

had not used an invalid number for over two decades.  Despite the circumstances surrounding

M.R.'s misconduct, CDCR concluded that he "lack[ed] many of the necessary qualifications

outlined in SPB Rule 172 including integrity, honesty, thoroughness, accuracy, good judgment

and the ability to assume the responsibilities and conform to the conditions of work

characteristic of a Peace Officer at this time" (TX 189, 223).

10. E.N. immigrated to the United States at age three.  CDCR withheld him from

the corrections officer and youth corrections officer positions in 2010 and again in 2012.  An

investigation worksheet showed that CDCR withheld E.N. in 2010 because he used a false

identification prior to naturalization and exhibited illegal behavior.  The 2010 and 2012

withhold letters, nearly identical, both stated: "You have disclosed fraudulent use of legal

documents, embezzlement of goods entrusted to you from two employers, purchasing property

you assumed was stolen, forgery and theft."  E.N. used an invalid SSN and false identification,

purchased by his mother, for employment purposes twice from December 2004–November

2007.  E.N., however, always used his personal information.  Investigative records also showed

that E.N. filed taxes while using the invalid SSN.  On his 2010 application, E.N. stated: "They

were only used for employment purposes, I DID NOT USE someone else's identity, I used my

information, The Social Security was [sic] Non-existing."  E.N. admitted to taking a discarded

United States District Court

For the Northern District of California

dog house on one occasion and to taking broken, unsalable merchandise or parts four times from work; CDCR determined these incidents to be "recent and severe," as written in a related discrepancy notice.  The withhold letter also cited several illegal acts that occurred before E.N. turned 18:  At age thirteen (2012 letter) or fourteen (2010 letter), E.N. purchased pirated movies and video games, which he assumed were stolen, from his cousin.  He forged his mother's name twice when in highschool to excuse his tardiness.  At age fifteen, E.N. stole $15 worth of goods, which he disclosed on his 2010 but not 2012 CDCR application.  An internal discrepancy notice described E.N.'s purchase of pirated movies as "not recent, but added to reflect the pattern of negative behavior."

11.     On an internal discrepancy notice dated August 2012, CDCR noted E.N.'s use of an invalid SSN and determined:  "The applicant has exhibited a pattern of not abiding by the law.  The applicant admitted to using fraudulent legal documents[, a fake photo ID and invalid social security card,] to gain employment in the United States.  These matters are both recent and relevant to the position for which the applicant has applied.  Rx Withhold."  CDCR noted the "recency" (approximately five years prior) of the conduct, concluding that it cut against E.N.  CDCR, however, did not appropriately weigh the nature and gravity of the offense.  On balance, the severity of E.N.'s conduct was minimal:  His mother purchased the invalid SSN; he only used the invalid number for employment purposes; he used his own information, thus not committing identity theft or harming another; and he filed taxes using the "I-10-10" form from 2004–2007.  Moreover, E.N. explained that he used a number that did not belong to anyone and stopped using it as soon as he obtained legal residency.  Given the circumstances surrounding E.N's use of the invalid SSN, CDCR neither sufficiently considered the EEOC factors nor connected E.N.'s conduct with his ability to serve as a corrections officer (TX 82, 83, 185).

12.     CDCR withheld J.M.(1) in 2014 for failing to comply with legal obligations, omitting pertinent information (*e.g.*, violation of a court order), and fraudulently obtaining legal documents to secure employment.  As an undocumented juvenile (sixteen to seventeen years old), over a decade prior to his CDCR application, J.M.(1) used an invalid SSN for a

work program for students.  J.M.(1) admitted that he failed to report his income to the IRS and did not pay taxes from 2004–2008.  The withhold letter noted that J.M.(1) worked five different jobs from age eighteen to his naturalization.  The letter also cited that J.M.(1) collected unemployment while working side-jobs.  During his military service in 2001, police pulled over J.M.(1) for driving while intoxicated and arrested him for underage drinking.  J.M.(1) also failed to include pertinent information on his CDCR application:  He neglected to disclose a motor vehicle accident that occurred within the past seven years.  He also failed to notify CDCR that he violated a court order in 2006:  J.M.(1) was charged with child abduction and ultimately held in contempt of the court for failing to comply with the custody order when his ex-wife threatened to leave the country with his daughter.  Moreover, J.M.(1) did not tell CDCR that police questioned him in 1997 for possession of a BB gun.  J.M.(1) explained that he did not reveal his contact with the police because it was minor, he did not recall the incident, or he did not know how to input the information into CDCR's questionnaire.

13.     CDCR did not adequately apply the three EEOC factors in assessing J.M.(1)'s use of an invalid social security card.  J.M.(1) disclosed that he used an invalid card as a juvenile for employment purposes only.  The withhold letter, however, noted that he worked five jobs from age eighteen to his naturalization, which is outside the time period of J.M.(1)'s conduct.  J.M.(1)'s withhold letter and file suggest that CDCR did not consider such mitigating factors (his status as a juvenile at the time of conduct and the lack of recency).  Given the circumstances surrounding J.M.(1)'s conduct, his use of an invalid card bears little weight on his ability to conduct himself with honesty, integrity, and good judgment as a corrections officer (TX 85, 211).

14.     CDCR withheld R.A.(1) (there were multiple applicants with the initials R.A.) in 2011 and he reapplied in 2014.  The status of his latter application is unclear from the record.  The withhold letter stated that R.A.(1) used a fake SSN to obtain employment from 1989–1993, when he was approximately fifteen to nineteen years old.  He failed to file taxes from 1989–2000 because of his undocumented status.  R.A.(1), however, subsequently paid his taxes back to 1997.  In the letter, CDCR wrote:  "For many years, you were an illegal alien in

this country.  You intentionally committed additional illegal acts by using fraudulent Social Security numbers to gain employment, and failed to file income taxes for over twelve years." The withhold letter also cited R.A.(1)'s negative military record as a reason for his disqualification.  In October 2001, while in the United States Army National Guard, R.A.(1) did not show up to the duty station for training because he had to handle a personal obligation related to his naturalization process.  A warrant subsequently issued.  R.A.(1) turned himself into police and spent approximately two-and-a-half weeks in jail.  R.A.(1) received less than an honorable discharge, but later re-enlisted in the Army.  In January 2004, he altered an authorization slip from one of his drill sergeants to see the doctor for a neck injury; R.A.(1) obtained the required slip but neglected to bring it to the appointment, so he forged an expired one.  In June 2004, R.A.(1) resigned from his civilian job at Copy Station because he suffered from a panic disorder, and in June 2005, he received an honorable discharge from the Army due to his medical condition.  CDCR also pointed to R.A.(1)'s resignation from the Border Control as a reason for his withhold.  In 2007, after his supervisor discovered that R.A.(1)'s wife did not possess legal status, R.A.(1) quit.  CDCR questioned whether R.A.(1) resigned to avoid an ensuing investigation or to accompany his wife to Mexico to complete her immigration process.  Previously, in 2009, R.A.(1) applied to CDCR but did not take any written or physical tests or complete the background investigation (TX 78, 176).

15.     CDCR has failed to show that it appropriately took all three EEOC factors into consideration with regard to R.A.(1)'s SSN misuse.  CDCR did not adequately examine the severity of the offense.  Nor the recency.  On balance, the gravity of R.A.(1)'s conduct was minimal: He made up a SSN as a juvenile and continued to use the number as a young adult in order to gain employment.  On his 2011 Background Investigation Questionnaire, he explained that his father and one of his father's friends invented the invalid number and completed the employment application for him in 1989.  R.A.(1) stopped using the invalid number approximately eight years before he first applied.  Thus, CDCR did not adequately show a connection between the conduct and characteristics required of a corrections officer.

United States District Court

For the Northern District of California

31

United States District Court

For the Northern District of California

16.     CDCR withheld D.F. in 2011 and again in 2014.  D.F. appealed CDCR's 2011

findings.  The 2011 withhold letter cited D.F.'s possible use of an invalid SSN in 1986 or

1987, over two decades prior to his application, to obtain employment; failure to disclose

court-ordered child support; and use of an alias and invalid SSN in 2001.  DF also had a

restraining order entered against him due to a dispute with a friend.  In his application, D.F.

said that he had never been ordered to pay child support; however, a background investigation

revealed that a court ordered him to pay support in 2001.  In his appeal letter, D.F. explained

that he understood the question regarding child support to apply only to when the divorce had

been finalized.  Moreover, he stated that he never used an alias or fake SSN in 2001 and

remained concerned that he was a victim of identity theft.  SPB denied D.F.'s appeal.  On his

subsequent application, D.F. attributed the alias and SSN used in 2001 to a court error (TX

207).

17.     CDCR again withheld D.F. in 2014.  The withhold letter highlighted several

reasons for CDCR's decision:  use of an invalid SSN and false documents in 1986–1988 to

gain employment; failure to file taxes while using the invalid SSN; misrepresentation on two

previous job applications; and delinquent student loans.  CDCR's internal discrepancy notice

and investigation worksheet noted that the applicant owed $969.00 on his student loan.  In the

withhold letter, the investigator wrote:  "You have admitted to using a made up Social Security

number and have not paid taxes for these years.  As well as using this number to gain

identification.  These voluntary admissions are quite alarming.  Peace Officer applicants are

required to possess certain qualities such as honesty and integrity.  You have failed to show

these characteristics." (TX 208, 218).

18.     CDCR's characterization of D.F.'s use of an invalid SSN as "quite alarming"

and  withhold of his application demonstrate that CDCR did not fully apply the EEOC factors.

An individual assessment and careful consideration would have revealed mitigating

circumstances.  D.F. used the invalid number in 1986 or 1987 (according to his 2011 withhold

letter) or from 1986–1988 (according to his 2014 withhold letter) "in order to get paid and eat"

and to establish identity.  This is a short period of time over two decades prior to his first

CDCR application.  He subsequently attempted to cure his mistake.  "I visited the social

security office on 12/13/13 to request information on the social security number . . . I did pay

taxes on that number but I failed to do my yearly income tax return.  When I received my

personal social security number I began using my number and doing my yearly income tax as

mandate [sic] by law" (TX 208, 218).  In sum, CDCR failed to appropriately evaluate the

nature and lack of recency of D.F.'s conduct.  CDCR has not shown a "demonstrable

relationship to successful performance of the job."  U.S. EQUAL EMP'T OPPORTUNITY

COMM'N, EEOC ENFORCEMENT GUIDANCE.